[Cite as *State v. King*, 2025-Ohio-351.]

THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

STATE OF OHIO,                          :

    Plaintiff-Appellee,                 : CASE NO. 23CA7

    v.                                  :

DARRYL KING,                            : DECISION AND JUDGMENT ENTRY

    Defendant-Appellant.                :

_____

APPEARANCES:

Stephen P. Hardwick, Assistant State Public Defender, Columbus, Ohio, for appellant[1].

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Pamela C. Wells, Assistant Prosecuting Attorney, Chillicothe, Ohio, for appellee.
_____
CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:1-31-25
ABELE, J.

{¶1} This is an appeal from a Ross County Common Pleas Court judgment of conviction and sentence. Darryl King, defendant below and appellant herein, assigns two errors for review:

> FIRST ASSIGNMENT OF ERROR:
>
> "THE TRIAL COURT ERRED BY FAILING TO ALLOW MR. KING TO INTRODUCE EVIDENCE OF THE DECEDENT'S THREAT TO HARM ANY FUTURE CELLMATE. EVID.R. 401, 402; 5.P. 59-61 (DAY 2)."

_____
[1] Different counsel represented appellant during the trial court proceedings.

SECOND ASSIGNMENT OF ERROR:

"MR. KING RECEIVED INEFFECTIVE ASSISTANCE OF
COUNSEL BECAUSE HIS TRIAL LAWYER DID NOT ARGUE
THAT MR. SAPP'S STATEMENT THAT HE INTENDED TO
HARM ANY FUTURE CELLMATES WAS ADMISSIBLE AS
EVIDENCE OF PLAN, INTENT, AND MOTIVE UNDER
EVID.R. 404(B), SIXTH AND FOURTEENTH AMENDMENTS
TO THE UNITED STATES CONSTITUTION; T.P. 59-61
(DAY 2)."

{¶2} In March 2022, a Ross County Grand Jury returned an indictment that charged appellant with one count of murder in violation of R.C. 2903.02, an unclassified felony, as a proximate result of felonious assault.  Appellant entered a not guilty plea.

{¶3} At trial, Ross Correctional Institution (RCI) Corrections Officer Andrew Lansing testified that on February 13, 2022, Inmate Alex Sapp and appellant had been cellmates for approximately two weeks in Unit 1A Cell 240 on the second floor.  Lansing believed "they were happy.  Inmate Sapp was happy being in that cell."  At around 9:00 p.m., Lansing conducted the standing count to account for all inmates and observed appellant lying on his bed and Sapp "sitting on the toilet."

{¶4} Later, when Inmate Sapp knocked on the cell door around

9:15 p.m., Officer Lansing walked upstairs to investigate:

> We open the door see what was going on.  Inmate Sapp was yelling about I believe it was they were had an argument about a chair or something, but you know what I'm saying.  That's what I got out of that.  Inmate Sapp said he didn't want to live in the cell no more, so I gave him an option, I said look it's nine fifteen p.m.  We can't move you.  He wanted to move downstairs to an empty bed and we have that go on a lot.  I said, you have an option, you can wait until the morning, because I work first shift overtime in the morning I was going to work.  I said, you can wait until the morning and I would take you to unit staff and get you moved if you don't want to live in the cell or I could send you to the Captain's Office and you can refuse to lock and go to 5B.

{¶5}  Officer Lansing explained that Inmate Sapp "chose to stay in the cell and be moved in the morning to unit staff."  When Lansing spoke with Sapp, "he had a laundry bag white laundry bag and the bed was stripped down . . . Inmate King stated that he was just reading his book and wanted to read his book.  He was laying [sic.] on the bed."  Lansing told Sapp to "climb up on the top of your bed, don't talk to each other tonight, just go to sleep and I'll get you moved in the morning.  He climbed up on his bed and I said, 'do you want your blanket and sheets?'  He said, 'no.'"  Lansing closed the door, and he returned to his downstairs post.

{¶6} Thirty minutes later, at 9:45 p.m., Officer Lansing looked into Cell 240, and "Inmate Sapp was sitting on the toilet [and] Inmate King was sitting up in the bed [bottom bunk] having a conversation." Lansing asked them, "if you're good . . . [and] Inmate Sapp, Inmate King both looked at me and I went downstairs." Lansing left at the end of his shift, and when he returned to the facility the following morning at 6:00 a.m., Lansing learned of the homicide and discovered the cell closed with the window covered.

{¶7} RCI Corrections Officer Kaitlin Truitt testified that she worked a double shift on February 13, 2022 from 1:30 p.m. to 10:00 p.m. and from 10:00 p.m. to 6:00 a.m. After she completed her usual paperwork, "nothing was going on," and the unit "was really quiet." As Truitt approached Sapp and appellant's cell, the nameplate had fallen off the door, which is a common occurrence. Truitt picked up the nameplate, noticed nothing out of the ordinary in the cell, logged her range check, and then went into the break area, maybe 15 feet from the door, with the door open.

{¶8} Around 10:45 p.m., Officer Truitt heard "what sound[ed] like a kick on a door or something or a bang." Truitt conducted

another range check, noticed that the Cell 240 door tag had fallen off again, and "heard banging on a door from 240." Truitt did not recognize the inmate in the cell window. The inmate said, "Hey CO I think you need to bring someone up here." At Cell 240, Truitt observed an inmate "on the floor with blood all over his face." Appellant told Truitt that "he - the inmate laying on the floor fell off his bunk and then the inmate that I was talking to just kept saying please don't spray me, please don't spray me." Truitt observed Inmate Sapp lying on the floor with "blood all over his face." Truitt testified that officers are not permitted to open cell doors alone on third shift, so she went to the desk to ask the Captain's Office how to proceed. Officer Grant Stinchcomb called for a nurse cart, opened the cell door, and "pulled the inmate [appellant] out of the cell and put him on the wall to cuff up." At that point, they removed both appellant and Sapp from Cell 240 and transported Sapp to the hospital. Truitt conceded on cross-examination that she did not observe what occurred in Cell 240 that evening.

{¶9} RCI Corrections Officer Grant Stinchcomb testified that

he worked a double shift on February 13, 2022, from 1:30 to 10:00 p.m. and 10:00 to 6:00 a.m.  On his second shift, he worked with Officer Truitt in 1B.  At approximately 10:45 p.m., Stinchcomb conducted his range check when Truitt approached and said, "an inmate was injured and needed help."  Stinchcomb stopped his range check and went to 1A.  When Stinchcomb arrived at Cell 240, "Inmate King was standing in the window with his hands up."  King said "he had not done anything," and Stinchcomb asked him to move aside to see the other inmate.  Stinchcomb observed the victim "on the floor bloodied and nonresponsive."  Although Sapp appeared to be breathing, "he was pretty beat up.  He's pretty battered . . . bloodied."

{¶10} Officer Stinchcomb instructed Officer Truitt to call their supervisor while he radioed for medical assistance.  After the officers received permission to open Cell 240, they "got Inmate King out of the cell."  Stinchcomb "put him on the wall and put him in cuffs" and "waited for back up."  Truitt told Stinchcomb that appellant said that Sapp "fell off a bunk."  However, Stinchcomb explained that he "could tell obviously that that's not a fall from

a bunk," so Stinchcomb asked appellant what happened, and appellant "told me that prior in that day they had an argument. They had a confrontation and . . . that confrontation may have gotten physical before, I'm not sure. He said that Sapp had hit him while he was reading a book lying in bed."

**{¶11}** RCI Registered Nurse Lisa Ragland responded to the medical emergency. When she arrived at Cell 240, she looked through the door and observed Sapp "on the floor between the urinal and sink and the bunk beds." Ragland and other RCI personnel performed CPR for 35-45 minutes while they waited for the EMS squad. Ragland described Sapp's injuries:

> Sapp's head was bloody and there was coagulated blood on the floor under his head with a lot of coagulated blood going off to the right side. Hie eyes were swollen black and blue. Behind his ears were black and blue. His ears were swollen. He had bruising to his face and there was like some contusions and abrasions around his head that were also bleeding . . . his breathing pattern was irregular. . . so instead of breathing in a normal pattern it was more like a . . . gasping pattern or he was only getting like six or seven breathes [sic.] a minute and that's not enough to sustain life.

**{¶12}** RCI Lieutenant Jordan Brabson testified that he is an on-scene shift supervisor and, on February 13, 2022 at approximately

9:45 p.m., officers called him to Cell 240 for assistance. When he arrived, Brabson observed Inmate Sapp "lying on the floor . . . covered in blood and . . . kind of gargling." Brabson heard appellant say, "I woke up and found him like this." Brabson photographed the cell, including the victim, waited until nursing staff arrived, called for EMS, and assisted in CPR until EMS arrived. Brabson then secured the cell, took more photographs, and hung paper over the window so other inmates would not look through and "possibly fish out any evidence from underneath the door." After that, Brabson took appellant to receive medical attention and photographed him, but did not ask any questions.

{¶13} RCI Lieutenant Ben Murphy testified that on February 13, 2022, staff summoned him to Cell 240 where he changed Inmate Sapp to his travel uniform and prepared him for transport. Murphy created a timeline, watched video footage, completed an incident report, photographed appellant, and collected appellant's shirt, pants, shoes, and socks as evidence. Murphy stated that he only observed injuries to appellant's hands.

{¶14} Ohio State Highway Patrol Trooper Marlin Folden testified

that RCI called him to investigate the incident and dispatched him to the hospital due to a "serious felonious assault. . . possibly going to be a fatal incident." By the time Folden arrived at the hospital, Sapp "had already been pronounced deceased." Folden photographed Sapp's body, swabbed his hands, and drove to RCI where he met Trooper Sherri Wells and RCI investigators. After Folden photographed appellant, he and Wells photographed Cell 240 and its contents. Folden stated on cross-examination that when he told appellant that Sapp died, "it wasn't a shock or surprise that I could see."

{¶15} Ross County Coroner's Office Investigator David Russell testified that, because any person who dies while in custody must have an autopsy, he visited the Adena Regional Medical Center to secure Inmate Sapp's body. Russell spoke to the nurse, doctor and guards and photographed and secured the body for transport to Montgomery County for a forensic autopsy.

{¶16} RCI Lieutenant Christopher Williams testified that he served as a corrections officer when summoned to Cell 240, where he observed Inmate Sapp "on the floor covered in blood struggling to

breathe." At approximately 1:15 a.m., Williams spoke with appellant, collected appellant's clothing, shoes and socks, and delivered them to the investigator's office.

{¶17} Ohio State Highway Patrol Investigator Sherri Wells testified that she investigated the incident along with Trooper Folden. Wells traveled to the prison around 1:00 a.m. and met with RCI Investigator Brian Wellinghoff, who had collected evidence. Wells observed video surveillance from Unit 1A and spoke with Officer Truitt. Wells observed appellant at about 2:40 a.m. and did not observe any injuries to appellant other than "his knuckles where the fingers fold, so the knuckles of like a fist area . . . if the fingers were folded, it would be those knuckles."

{¶18} Trooper Wells also photographed Cell 240 and collected Sapp's clothing. "There was blood over most of the clothing. The shirts were so saturated with blood that I had to take them to a special area to allow them to hang to dry before they could even be properly collected for keeping." Wells initially indicated surprise at not finding blood on the bottom of appellant's shoes because Trooper Folden told her that he saw "what he thought was a

pattern in a couple of his photos and he showed those to me."
Wells explained that she examined the shoes and "the pattern to me
appeared similar from the bottom of the shoe to the pattern on the
face." When Wells investigated why "there was blood on the top,
but not on the bottoms," she learned that when appellant "was
removed from 1A and taken to Nine House, which is a complete walk
from the north side to the south side of the compound, that he was
walked there in these shoes and that there was snow on during the
time." Wells also collected the RCI incident reports and requested
a "full shakedown of the . . . cell." "[N]o contraband was found
consisting of any other weapons, any other drugs, or anything of
that . . . kind."

{¶19} Montgomery County Forensic Pathologist Susan Brown
testified that she photographed and examined Sapp's body. Brown
noted that Sapp had no hand injuries, but sustained multiple
bruises, abrasions, and lacerations, "at least four between his . .
. eyes, one on the right eyebrow, one on the right eyelid, two on
his right cheek right below his right eye and one on the ride side
of his upper lip." "He has multiple bruises on his nose and his

nose is fractured." "On the right side of his mouth . . . at the corner . . . there is what we call a patterned injury.  It is an abrasion or scrape of the skin that has a very distinct design or a pattern . . . that is the same pattern is the object that was used to make that injury."  Brown explained, "there are multiple areas . . . he also has that same pattern on his right cheek, on the right side of his forehead, and on the right side of his scalp."  Brown described the pattern as "linear lines that are also evenly spaced from one another and in some areas, they appear to be a portion of the triangle and in other places appear to be just linear lines again that are equally spaced between each other."  Brown also testified that Sapp sustained multiple bruises and injuries to both ears, the left side of his head, and at least four separate abrasions with bruising on Sapp's left side of his scalp.  Brown testified that it would require "significant force" to leave the patterned marks on Sapp's body and explained that the injuries could be consistent with someone stomping on the victim's head or "any kind of blunt force trauma by whether it's a . . . hand, or a foot, or an object."  Brown also acknowledged that the abrasions

could be consistent with that side of the victim's head rubbing on a concrete floor with force applied to the other side.

{¶20} Dr. Brown further testified about the internal bruising of the victim's muscles along his skull, "another marker of blunt force injury." Brown observed fractures to Sapp's left frontal and parietal bones, a subarachnoid hemorrhage, and blood surrounding the brain, which "again is a marker of injury." Brown found another skull fracture at the base of the skull on the left side. Brown also testified that the toxicology report found the antidepressant sertraline within a normal limit. Brown characterized Sapp's cause of death as "multiple blunt force injuries . . . to his head."

{¶21} On cross-examination, when counsel asked Dr. Brown if the toxicology report found synthetic cannabinoids, Brown replied that the toxicology analysis did not include a test for that substance. Brown explained that nothing in the course of the autopsy caused her to believe that she should order further toxicology tests.

{¶22} Appellant testified that he served time in prison because three years before, he "got into a fight with a cop," but as of

February 13, 2022, appellant "had twenty-eight days left."  Alex

Sapp became appellant's cellmate on February 1, and he did not know

Sapp before then.  When asked to describe his relationship with

Sapp, appellant stated: "Not good.  I was pretty leery of him.

When he became my cellie, he was tooken from another prison and

only been in Ross for thirty days and he was explaining to me that

he had troubles with the other prison, because of his case."

Appellant stated

At first everything was normal.  I just kind of - - we
didn't really talk a lot the whole time he was in my cell.
Nine days is a lot to get to know people, so that day after
2:00 o'clock rec when we came back, Alex had gotten out -
- had gotten K2 while he was out from 2:00 o'clock to 3:00
o'clock rec and when I came back, he was noticeably messed
up on drugs.

**{¶23}** When asked to describe K2, appellant stated, "well in

prison . . . it's pieces of paper people smoke and they get high

off of it."  Appellant explained, "Alex use[d] two razor blades on

a wire, and we plug it in and touch the blades together and smoke

it.  They call it vaping and people . . . have strong reactions to

it all the time.  It's like PCP.  People fall out on it.  They go

crazy.  Some people come out of their cell naked they fight CO's

all the time."

{¶24} Appellant explained that, because February 13, 2022 was Superbowl Sunday, he prepared his "[commissary] store list . . . and tr[ied] to get a little bit of food and everything to make for the game."  Appellant explained that he had given away his TV and most of his clothes and hygiene products because he only "had thirty days left" on his sentence.  He explained that he had a "pretty good rapport" with Corrections Officer Lansing, "so he chose to open my door even though it wasn't my rec and let us go down to the TV area, so that I could watch . . . the game."

{¶25} Appellant "notice[d] [Sapp] wasn't even working on his store list at all.  He was just . . . kind of smoking and . . . pretty messed up sitting on the toilet."  Appellant did not interact with Sapp during the game.  When Officer Lansing shut down the day room at 8:00 p.m., he and Sapp returned to their cell. When appellant returned, "Alex was already in the cell smoking again when I went into the cell and . . . closed the door at about 8:00 o'clock."  Appellant organized his clothes and toiletries for the next day and resumed reading his book.  However, Sapp "was

still messed . . . he was smoking, and he was upset."

{¶26} Appellant explained that when he returned to the cell, Sapp asked him if he discussed Sapp's case with anybody.

> I told him that I never put anybody's business to anybody else. Prison is the kind of place everything you talk about discussed with everybody else, so anything you say is going to come to light with all the other inmates. I have four prison numbers and I just did thirty-six months in Ross Correctional, so I don't talk about anybody's case or anything at all to do with them with other people, because it always comes back on you and that's what I told him, but he wasn't . . . hearing it.

{¶27} Appellant testified that, because Sapp "was upset in the cell, he knocked on the door and called Lansing up there."

{¶28} Although Sapp had a restriction that prohibited his assignment to a top bunk, when he arrived at Cell 240 officials had already assigned appellant to the bottom bunk and Sapp to the top bunk. Appellant explained that "you cannot switch bunks on your own" because you "would get a ticket for being out of place." Appellant stated that Sapp "had already started packing his bag and was expecting him [Officer Lansing] to move him. When they didn't, he started yelling at me and telling me that he was going to sell our chair. Somebody had offered him something for the chair in the

cell or something.  I told him that they were probably just making fun of him.  That they weren't going to give him anything." Appellant stated that at this time, he "was crunched up . . . on the bottom bunk right by the wall."

{¶29} Appellant stated that Sapp "was mad, and he was telling me that he . . . double knotted his shoes" and Sapp "kind of made a real big show out . . . of putting his shoes on."  Appellant explained that "in prison usually when somebody puts their shoes on they want to fight you know, so he was yelling at me, double knotting his shoes, and packing everything he owned into a bag." Appellant asked Sapp, "what's your problem with me?  I'm not the one doing this stuff and why are you packing your bag?"  Sapp said, "when I'm done packing this bag I might either take the bottom bunk or I don't know what I'm going to do."  Appellant explained to Sapp, "if you touch me, I'll yell for the cops, because they know you're acting stupid already and you're going to go to the hole."

{¶30} Appellant testified that when Sapp put his shoes on, appellant "grabbed [his] shoes and put them on too.  Just to kind of say hey you got your shoes on and if you attack me, I'm not

barefoot. I have my shoes on too. Kind of just posturing you know. Like I said, I had only been in the cell with him for nine days and after he talked to Lansing, he he was telling me, well I know you . . . talk to somebody else and I'm going to tell you, I want the bottom bunk and they're going give it to me."

**{¶31}** Appellant stated, "after I put my shoes on Alex sat down on the toilet and I said, man look I really don't want to fight you man." Sapp said that he did not want to fight appellant either and said he "was just upset about everything, and he's worried about the people in the dorm." Appellant told Sapp that he "shouldn't worry about people in the dorm that this ain't that kind of block and whatever jail he came from nobody's going to be pressing you or anything and and I just tried to talk him down really and calm him down." Appellant stated that he sat on his bunk and Sapp sat on the toilet when Lansing stopped again and "gave the thumbs up in the door." Lansing told Sapp "to get up in his bed and go to sleep and I was still sitting on my bed, so he - - we just - - I thought that the conflict was resolved and that everything was cool."

**{¶32}** Appellant continued, "He starts to smoke again. He was

smoking again, so I had a big 5X coat, because I had give away my blanket too, so I had a big 5X coat that I used just to cover up with until - - until I was going home you know."  Appellant stated, "I kept my shoes on because he had his on too."  Appellant tried to give Sapp "a little bit of personal space."  Appellant stated that he talked to appellant "for a good thirty minutes" before he covered up with his coat on his bunk.  He testified that Sapp "was super calm saying that he just might not even move out the next day.  He said that he always does this he'll have a good thing going and . . . he'll ruin it before he even gets a good chance.  He said, he liked being my cellie and I never did anything to him and that he was just worried about other people in the block and things of that nature, so . . . I thought it was chill.  I thought the moment had passed you know that the confrontation was over."

{¶33} Appellant testified:

I thought it was over, but he had only been in my cell nine days, and I was a little bit leery of him, because he was still kind of jerky.  You know his movements were jerky and he was smoking too, so I was still kind of leery, but I did think it was over yeah.  I didn't think we were going to fight . . .  When I covered up with the coat like I said, he had started smoking before I covered up and I was just doing a few breathing exercises and stuff and he

stepped close to me and I sensed that he was close to me and it was dead quiet and just the hair stuck on the back of my neck and I flipped my coat off of me with my left arm and threw it against the wall and Alex was right in my face with his bloodshot red eyes and and grabbed me by my hair and yanked me out of the bunk. . . I was on my knees, and he had his hands in my hair and he wrapped his arm underneath my chin and lifted up and choked me out just as fast as as that.  I didn't have the opportunity to do anything.  I was just completely choked out that quick and then I woke up on the ground with my head facing the toilet and when I woke up I didn't . . . even immediately remember that I was in a fight. . . I woke up and I was like I was confused, because I was on the floor and when I started moving around, he jumped back on my back.

I was terrified.  I was scared and . . . in a panic and stuff.  I realized hey, I'm in a fight with my cellie and remembered he had just choked me out and when he jumped on my back, I started screaming.  I started screaming help and and and yelling for the CO's and stuff and he was [inaudible] to get his hand around my mouth . . . and my neck and I started kicking behind me with my heel and my heel . . . my foot caught the crotch of his pants and kind of kicked him off of me a little bit and when we stood up we both kind of exchanged a few punches.  Well, behind Alex was a chair on the front of the wall.  The back of his leg caught the chair, and he sat down in the chair and I punched him in the face like ten times as hard as I could . . . seven or ten times, but they had no effect on him.  They didn't even stun him.  The first few punches did absolutely nothing to him.  Like I said, when people smoke K2 it's like a PCP high.

{¶34} Appellant explained that he then ran back to the door and started to kick the door and yell for help when Sapp

came up behind me from the side of the toilet over my shoulder . . . and he grabbed . . . my neck again and Alex was a lot stronger than me and . . . he was really good at like grabbing you and twisting you around and like controlling your body like that . . . when he grabbed me over my shoulder with his arm around my neck and then he stepped in close behind me to where his knees were up under my butt, and he completely had control of me. . . I put my chin down . . . and he grabbed my face and . . . was saying, 'I'm going to kill you, I'm going to kill you,' . . . and I was trying to stomp on his toes and doing everything I could to get him off of me. Now, I smashed his head against the side of the door. I rubbed his head against the side of the thing. Doing everything I could to get him off of me. . . and he was squeezing . . . my face so hard that I didn't . . . my jaws turn sideways and my teeth were cracking. . . I was scared to death. . . I kept thinking I was hearing keys . . . but they weren't coming. . . eventually, his arm started shaking and his grip just gave out and I grabbed his wrist . . . with my hand and put my thumb underneath . . . of his shoulder and bumped his . . . legs with my hips and got him on my back and I flung him over my back as hard as I could onto his head. . . he attempted to rise, and I kicked him in the face a couple times. Two times with him getting up and the second kick knocked him out.

**{¶35}** Appellant testified that fellow inmate Cody Cline looked in and told him he would "yell out the window . . . you start kicking the door." Appellant stated that, with his back to the door so he could watch Sapp, he kept "donkey kicking" the door with his heel and yelling for help for five or ten minutes. Appellant said he could tell Sapp "was having trouble breathing . . . and was

coughing and choking," so appellant turned Sapp on his side and then resumed kicking the door.

**{¶36}** When Officer Truitt arrived, appellant told her that Sapp fell out of his top bunk so she would not mace the cell, which is their standard protocol. After Truitt returned to the cell with Officer Stinchcomb, Stinchcomb asked appellant what happened and appellant "told him that Alex attacked me while I was laying down and that I fought him off and I need help." When appellant later found out that Sapp died, he said he "was in shock. I felt like my whole life was over. I was - - told them that I was twenty-eight days at the door [28 days from the end of his prison sentence]. I couldn't believe what was happening. I just felt in shock."

**{¶37}** On cross-examination, appellant acknowledged that at the time of the incident he served time for aggravated possession of methamphetamine, domestic violence, and the assault of a peace officer. Appellant also stated that he had seen Sapp smoke K2 at least three times that day. Appellant acknowledged that he is 6'1", but disputed institutional records that reflected his weight as 220 pounds. Appellant also testified that he did not recall

telling Trooper Wells that he fought "for just a minute that he had thrown down on him."  Appellant disputed that he told Wells that he had "already washed [his] hands and got most of the blood off," but acknowledged that he did not tell Wells that Sapp choked him unconscious.

{¶38} After the defense rested, appellee called Trooper Wells as a rebuttal witness.  Wells testified that appellant told her that he observed Sapp smoke K2, he had kicked the cell door for about 30 minutes, and that he could not believe Sapp died.  Wells stated that appellant told them Sapp hit him in the left side of the face and slammed the back of his head, which is why their photos focused on that area.  Wells said that appellant told her that Sapp hit him a few times and "that he threw down on him and that he punched him until he stopped."  When Wells told appellant that she planned to swab his hands, appellant "said he had already washed most of the blood off, asked if he could refuse, and was told no he could not refuse."  Wells explained that Cell 240 contained a sink.  Wells also acknowledged that appellant told her, "I have three kids and a Mom that is seventy-five and I'm going

home in twenty-eight days.  Now, I'm looking at killing someone, he wouldn't stop fighting me."

**{¶39}** After deliberation, the jury found appellant guilty of murder in violation of R.C. 2903.02, an unclassified felony.  The trial court considered the pertinent sentencing statutes and factors and sentenced appellant to serve a 15-year to life prison term.  This appeal followed.

I.

**{¶40}** In his first assignment of error, appellant asserts that the trial court erred when it did not allow him to introduce evidence concerning the decedent's previous non-specific threat to harm any future cellmate.  Specifically, appellant contends that evidence of a generalized threat to inflict harm to a future cellmate is relevant to whether the threat-maker attempted to harm appellant a few weeks later.

**{¶41}** On the second day of the trial, during the cross-examination of Trooper Wells, counsel asked, "As part of your investigation, were you made aware of a conduct report on Inmate Sapp from January 21, 2022."  Wells replied, "Yes."  Counsel then

asked, "And what was the contents of that report?"  After appellee

objected, the trial court held a bench conference and the following

exchange occurred:

> The State: I'd argue relevance to a prior conduct report without any sort of foundation that it doesn't involve the defendant or.
>
> Defense Counsel: (inaudible) There is a report that basically says he was directly threatening (inaudible).
>
> The State: Which I can see the potential argument about he - he didn't threaten inmate. He threatened any inmate who.
>
> Defense Counsel: His cellmate.
>
> The State: Who would be placed in his cell.
>
> Defense Counsel: Correct.
>
> The State: So, he threatened a hypothetical person that had not happened yet.  Secondly.
>
> The Court: When did this occur?
>
> Defense Counsel: January 22nd or 21st.
>
> The State: January 21st. Plus, I don't think it was done in the presence of the defendant that he would be able to use that as evidence of self-defense or anything to form a reasonable belief.
>
> Defense Counsel: But the defendant was made aware of it.
>
> The State: I don't think that.

The Court: When was he made aware of it.

Defense Counsel: When Inmate Sapp told him why he there. He had just come off restrictions, but I don't think I.

The Court: What was your question exactly again?

Defense Counsel: Was she made aware of the report which it was given to her.

The State: Well, no.  You - - she answered then they (inaudible) then you asked her, what were the contents of the allegations.

Defense Counsel: Yeah, what was the allegation in the report?

The Court: and who made the allegation?

The State: I believe it was a C.O.

Defense Counsel: It was.

The State: Who overheard Sapp say, well I going to.

The Court: Alright.

Defense Counsel: Sapp said it you're right.

The Court: I [am] going to sustain it again.


{¶42} " '[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of

procedure and evidence.' "  *State v. Jackson*, 2020-Ohio-5339, ¶ 21 (5th Dist.), quoting *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991).  "Absent an abuse of discretion, this court may not reverse a trial court's decision with respect to the scope of cross-examination."  *Calderon v. Sharkey*, 70 Ohio St.2d 218 (1982), syllabus; *State v. Moore*, 2023-Ohio-494, ¶ 24 (4th Dist.).  " 'An abuse of discretion is more than an error, it means that the trial court acted in an "unreasonable, arbitrary, or unconscionable" manner.' "  *Matter of J.M.,* 2021-Ohio-1415, ¶ 39 (4th Dist.), quoting *State v. Kister*, 2019-Ohio-3583, ¶ 46 (4th Dist.), quoting *State v. Reed*, 110 Ohio App.3d 749, 752 (4th Dist. 1996), citing *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶43} As a general rule, all relevant evidence is admissible. Evid.R. 402; *State v. Russell*, 2022-Ohio-1746, ¶ 77 (4th Dist.). Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Evid.R. 401 and Evid.R. 402.  Evid.R. 611(B) states, "Cross-examination shall be permitted

on all relevant matters and on matters affecting credibility." Further, the exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. *See State v. Rapp*, 67 Ohio App.3d 33, 36 (4th Dist. 1990); *Delaware v. Van Arsdall*, 475 U.S. 673 (1986); *Moore* at ¶ 27.

{¶44} In the case at bar, appellant asserts that Sapp's threatening statement, given to a corrections officer and resulted in a written misconduct report 23 days before the assault, constitutes relevant evidence. Appellee, however, disputes the threat's relevance because (1) no evidence exists to prove appellant knew about the threat prior to the incident, (2) no evidence exists to prove the threat involved appellant, and (3) case law deems specific instances of a victim's conduct irrelevant if offered to show the victim was the aggressor pursuant to Evid.R. 405(B). Appellee argues that any alleged comment the victim may have made constituted a conditional threat regarding some hypothetical future cellmate and occurred over three weeks before the incident.

**{¶45}** Appellant cites *State v. Marshall*, 2007-Ohio-6298 (4th Dist.), that observed it "is well established that evidence of a defendant's threats, violence, or other obsessive behavior in the months preceding a murder is probative of the defendant's motive or intent." *Id.* at ¶ 50, quoting *State v. Brown*, 2002-Ohio-6765, ¶ 27 (3d Dist.). Appellant also argues that even generalized threats are admissible to show motive, plan, and intent if the assault victim is in the class of people included in the threat, citing *State v. Nicely*, 2004-Ohio-3847. In *Nicely,* the defendant arrived at the victim's house, brandished a gun, and made threats. This court found the testimony relevant and admissible under Evid.R. 404(B) and noted that

> [the witness] testified that shortly before the fire, appellant came to his house intoxicated, waved a gun and threatened to kill the 'M.F.'er.' While the identity of the 'M.F.'er' to whom appellant referred was not definitively revealed, this evidence established that appellant was angry at someone that evening - angry enough to kill that person or, possibly, to burn down his home.

*Nicely* at ¶ 19.

**{¶46}** In addition, appellant cites *State v. Brown*, 2002-Ohio-6765 (3d Dist.), in which a jury found the defendant guilty of the

murder of her boyfriend.  The trial court admitted testimony from witnesses regarding prior acts of violence and threats the defendant made toward the victim and the victim's former girlfriends.  The Third District affirmed that "[t]he nature of their relationship bore directly on whether she had a motive to harm him or acted knowing that her actions would cause physical harm."  *Id.* at ¶ 27.  However, as appellee points out, *Marshall, Nicely,* and *Brown* all involve a defendant's statements, not a victim's statements, and therefore are of limited relevance to our analysis.

**{¶47}** Finally, in his reply brief appellant cites *State v. Roberts*, 2007-Ohio-856 (1st Dist.) to support his argument that Sapp's January 21, 2022 generalized threat is a "time, mode or situation threat."  In *Roberts,* the First District upheld the trial court's decision to allow testimony from the victim that the defendant raped her with a similar modus operandi approximately 18 years before.  Specifically, both rapes occurred in the kitchen of the victim, and in both cases the defendant used a kitchen knife to perpetrate the crime.  The court found similarities relevant to

establishing Roberts' modus operandi and for his identification as the perpetrator. *Id.* at ¶ 16. The court found it "extremely significant that, although Roberts attacked Green in 1980, he was not released from prison until 2003. And given that Price was murdered in the fall of 2003, Roberts had been out of prison for less than four years before committing this crime." *Id.* at ¶ 15. Again, however, we observe that *Roberts* involved a defendant's statements and actions, not a victim's generalized statement.

{¶48} Appellee argues that in the case sub judice, appellant failed to establish the relevance of the purported threat and cites *State v. Elkins*, 2019-Ohio-2427 (4th Dist.). In *Elkins*, the trial court improperly permitted the prosecution to elicit testimony from the defendant's wife that appellant shot his son 13 years before he shot and killed his wife's paramour. *Id.* at ¶ 31. We observed that "[t]he other acts of the defendant must have such a temporal, modal and situational relationship with the acts constituting the crime charged that evidence of the other acts discloses purposeful action in the commission of the offense in question. The evidence is then admissible to the extent it may be relevant in showing the

defendant acted in the absence of mistake or accident." *Id.* at ¶ 22, citing *State v. Burson*, 38 Ohio St.2d 157, 159 (1974), citing *State v. Moore*, 149 Ohio St. 226 (1948).

{¶49} Thus, appellee argues that appellant failed to establish the purported threat's relevance because appellant failed to establish the circumstances regarding time, mode, situation, and connection to appellant. In addition, as appellee observes, each case also shows a defendant's pattern of jealousy and possessiveness toward a particular victim. Moreover, appellee points out that the Supreme Court of Ohio held, "threats made by a defendant against a particular person with whom [a defendant] had a quarrel sometime previously, were not admissible against him in his trial for killing another person in a different quarrel, there being no relation between the two instances." *State v. Moore*, 149 Ohio St. 226 (1948).

{¶50} Finally, appellee argues that, although a defendant's knowledge of a victim's prior act or threat may be admissible in evidence to prove a defendant's fear of imminent danger, if the defendant is aware of the statement or the threat, evidence of the

statement or threat should not be admissible to show the victim acted as the aggressor, as appellant argues. Appellee also cites *State v. Steinhauer*, 2014-Ohio-1981 (4th Dist.), when the trial court denied the admission of specific instances of the victim's prior violence, prior use and knowledge of weapons, aggressive behavior when he consumed alcohol, and prior threats to business associates. *Id.* at ¶ 24. This court observed that "a defendant is allowed to introduce specific instances of the victim's prior conduct. . . to establish defendant's state of mind." *Id.* citing *State v. Carlson*, 31 Ohio App.3d 72, 73 (8th Dist. 1986), paragraph one of the syllabus. But "[t]hese events are admissible in evidence, not because they establish something about the victim's character, but because they tend to show why the defendant believed the victim would kill or severely injure him." *Steinhauer*, citing *Carlson.* However, "Evid.R. 405(B) precludes a defendant from introducing specific instances of the victim's conduct to prove that the victim was the initial aggressor." *Steinhauer* at ¶ 29, citing *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). We held that, "[t]he critical issue is what the defendant knew about the alleged

victim at the time of the confrontation." *Id.*, citing *State v. Busby*, 1999 WL 710353 (10th Dist. Sept. 14, 1999).

{¶51} In the case sub judice, although appellant may fall within the general subset of "any inmate who would be placed in his cell," appellant did not allege and no evidence exists that at the time of the incident appellant knew about the statement. Thus, we conclude that the trial court did not abuse its discretion when it excluded evidence of the victim's alleged general threat.

{¶52} Moreover, and as more fully discussed under appellant's second assignment of error, even if, for purposes of argument, the trial court should have admitted evidence of the victim's prior, generalized threat to harm future cellmates, in light of the evidence adduced at trial the result would not have changed. Here, appellant claimed self-defense and asserted that the victim "jumped on his back" and they exchanged punches, but the first few punches "did nothing" so appellant "punched him seven to ten more times." However, the evidence adduced at trial reveals that appellant inflicted severe harm to the victim, far beyond any acceptable level of force necessary to repel any perceived threat. The only

injury appellant sustained appears to be to the knuckles of his hands, whereas the victim succumbed to his injuries that included multiple bruises, abrasions and skull fractures that resulted from severe blunt force trauma.  To establish the elements of self-defense, a defendant (1) must not be at fault in creating the situation giving rise to the affray, (2) must have a reasonable grounds to believe and an honest belief that the defendant was in immediate danger of death or great bodily harm and the only means of escape was by use of force, and (3) did not violate any duty to escape to avoid the danger.  *State v. Williford* (1990), 49 Ohio St.3d 247.  Most important here, a defendant is privileged to use only force reasonably necessary to repel the attack.  *Williford*, citing *State v. McLeod* (1948), 82 Ohio App. 155.  In the case sub judice, any reasonable person would conclude that the force appellant applied in this situation far exceeded the force necessary to repel the alleged attack.

{¶53} Accordingly, based upon the foregoing reasons we overrule appellant's first assignment of error.

II.

{¶54} In his second assignment of error, appellant asserts that his trial counsel rendered ineffective assistance of counsel in violation of his constitutional guarantees. In particular, appellant contends that his counsel failed to argue that the decedent's statement, that he intended to harm any future cellmate, should have been admissible as evidence of plan, intent, and motive under Evid.R. 404(B) and the Sixth and Fourteenth Amendments to the United States Constitution.

{¶55} The Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has generally interpreted this provision to mean a criminal defendant is entitled to the "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984).

{¶56} To establish constitutionally ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced the defense and deprived the defendant of a fair trial. *See*

*Strickland*, 466 U.S. at 687; *State v. Myers*, 2018-Ohio-1903, ¶ 183; *State v. Powell*, 2012-Ohio-2577, ¶ 85.  "Failure to establish either element is fatal to the claim."  *State v. Jones*, 2008-Ohio-968, ¶ 14 (4th Dist.).  Moreover, if one element is dispositive, a court need not analyze both.  *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

{¶57} The deficient performance part of an ineffectiveness claim "is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' "  *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010), quoting *Strickland*, 466 U.S. at 688.  Prevailing professional norms dictate that "a lawyer must have 'full authority to manage the conduct of the trial.' "  *State v. Pasqualone*, 2009-Ohio-315, ¶ 24, quoting *Taylor v. Illinois*, 484 U.S. 400, 418 (1988).

{¶58} Further, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  *Strickland*, 466 U.S. at 688.  Accordingly, "[i]n order to show deficient performance, the defendant must prove that

counsel's performance fell below an objective level of reasonable representation." *State v. Conway*, 2006-Ohio-2815, ¶ 95 (citations omitted).  In addition, when considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*  Additionally, "[a] properly licensed attorney is presumed to execute his duties in an ethical and competent manner." *State v. Taylor*, 2008-Ohio-482, ¶ 10 (4th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100 (1985).  Therefore, a defendant bears the burden of showing ineffectiveness by demonstrating that counsel's errors were "so serious" that counsel failed to function "as the 'counsel' guaranteed * * * by the Sixth Amendment." *Strickla*nd, 466 U.S. at 687; *e.g., State v. Gondor*, 2006-Ohio-6679, ¶ 62; *State v. Hamblin*, 37 Ohio St.3d 153, 156 (1988).

{¶59} To establish prejudice, a defendant must demonstrate that

a reasonable probability exists that "but for counsel's errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine the outcome." *Strickland*, 466 U.S. at 694; *e.g., State v. Short*, 2011-Ohio-3641, ¶ 113; *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus; *accord State v. Spaulding*, 2016-Ohio-8126, ¶ 91 (prejudice component requires a "but for" analysis).  " [T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Strickland*, 466 U.S. at 695.  Further, courts ordinarily may not simply presume the existence of prejudice but must require a defendant to establish prejudice affirmatively. *State v. Clark*, 2003-Ohio-1707, ¶ 22 (4th Dist.).  This court has recognized that speculation is insufficient to establish the prejudice component of an ineffective assistance of counsel claim. *E.g., State v. Tabor*, 2017-Ohio-8656, ¶ 34 (4th Dist.); *State v. Jenkins*, 2014-Ohio-3123, ¶ 22 (4th Dist.); *State v. Simmons*, 2013-Ohio-2890, ¶ 25 (4th Dist.); *State v. Halley*, 2012-Ohio-1625, ¶ 25 (4th Dist.); *State v. Leonard*, 2009-Ohio-6191, ¶ 68 (4th Dist.);

*accord State v. Powell*, 2012-Ohio-2577, ¶ 86.

**{¶60}** Here, appellant contends that his trial counsel rendered ineffective assistance when he failed to argue what appellant deems to be the strongest theory to support the admission into evidence of Sapp's statement that he intended to harm any future cellmate. Appellant characterizes admission of evidence of plan, intent, and motive under Evid.R. 404(B) as the strongest theory, and alleges that, if counsel had not failed to get this "critical information" to the jury, there is a reasonable probability of a different result.

**{¶61}** Evid.R. 404(B) provides: "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

**{¶62}** Appellant contends that the trial court implicitly determined "there is evidence presented that tends to support that

the accused person used the force in self-defense" when it
instructed the jury on self-defense. *State v. Messenger*, 2022-
Ohio-4562, ¶ 20. The burden regarding self-defense, established by
H.B 228 in 2019, is:

> A person is allowed to act in self-defense * * *. If, at
> the trial of a person who is accused of an offense that
> involved the person's use of force against another, there
> is evidence presented that tends to support that the
> accused person used the force in self-defense * * *, the
> prosecution must prove beyond a reasonable doubt that the
> accused person did not use the force in self-defense * *
> *.

R.C. 2901.05(B)(1).

**{¶63}** As *Messenger* observes, the plain language of R.C.
2901.05(A) reflects that self-defense is an affirmative defense and
the burden of production is on the defendant. If a defendant
produces sufficient evidence of self-defense, the prosecution has a
duty to overcome that evidence. R.C. 2901.05(B)(1). In *Messenger,*
at the close of the defendant's jury trial, the trial court
provided the jury with a self-defense instruction that signaled the
trial court's conclusion that Messenger put forward sufficient
evidence that he acted in self-defense when he killed the victim.

The court continued, "[t]he guilty verdict means that the state met its burden of persuading the jury beyond a reasonable doubt that Messenger was not acting in self-defense when he killed [the victim.]" *Id.* at ¶ 26.

**{¶64}** As appellee points out, a self-defense claim includes the following elements:

> (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

*State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).

**{¶65}** "Evidence as to all elements of self-defense must be presented at trial in order for a defendant to be acquitted, but to overcome the claim, the state need only disprove one element of the defense by proof beyond a reasonable doubt." *State v. Ballein*, 2022-Ohio-2331, ¶ 31. In particular, with regard to the second element, a defendant must show he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force. *State v. Goff*, 2010-

Ohio-6317, ¶ 36.  One component is a showing that a defendant used

"only as much force as is reasonably necessary to repel the

attack."  *State v. Jackson*, 2015-Ohio-478, ¶ 19 (12th Dist.); *State*

*v. Carney*, 2020-Ohio-2691, ¶ 30 (10th Dist.).  Thus, the degree of

force used must be warranted under the circumstances and

proportionate to the perceived threat.  *State v. Kean*, 2019-Ohio-

1171, ¶ 58 (10th Dist.).  Therefore, " '[i]f * * * the amount of

force used is so disproportionate that it shows an "unreasonable

purpose to injure," the defense of self-defense is unavailable.' "

*State v. Bundy*, 2012-Ohio-3934, ¶ 55 (4th Dist.), quoting *State v.*

*Macklin*, 2011-Ohio-87, ¶ 27 (8th Dist.).  *See Martin v. State*,

2022-Ohio-2580, ¶ 28 (8th Dist.) (concluding "that Martin

voluntarily entered the encounter by proceeding to the police

station parking lot and that he exceeded the force reasonably

necessary for self-defense by using a deadly weapon"); *State v.*

*Bender*, 2024-Ohio-1750, ¶ 26 (defendant voluntarily entered fight

and used excessive force).

**{¶66}** In the case sub judice, although appellant testified that

he acted in self defense, "the credibility of witnesses is primarily a determination for the trier of fact." *State v. Banks*, 2011-Ohio-5671, ¶ 13 (8th Dist.), citing *DeHass*, 10 Ohio St.2d 230, at paragraph one of the syllabus. "The trier of fact is best able 'to view the witnesses and observe their demeanor, gestures[,] and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 24, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80-81 (1984). Moreover, as appellee points out, appellee proved to the jury that appellant used unreasonable force. Appellant testified that he "smashed [Sapp's] head against the side of the door . . . got him on my back and I flung him over my back as hard as I could onto his head . . . he attempted to rise, and I kicked him in the face a couple times. Two times with him getting up and the second kick knocked him out." Again, Dr. Brown testified that appellant sustained no injuries, except to his knuckles. Injuries to appellant's hands and no injuries to the victim's hands, along with significant evidence of severe blunt force trauma to the victim's head underscore the lack

45

of proportionality in the case at bar.  Thus, the degree of force appellant used is extremely disproportionate to the alleged perceived threat.

**{¶67}** Finally, to conclude that appellant's trial counsel performed ineffectively, appellant must establish prejudice.  In other words, appellant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland* at 694.  A "reasonable probability" is more than "some conceivable effect," but less than "more likely than not [the error] altered the outcome of the case."  *Strickland* at 693.  A "reasonable probability" is a probability sufficient to undermine confidence in the result of the proceeding.  *Strickland* at 690-691; *Williams v. Taylor*, 529 U.S. 362, 390-391 (2000).

**{¶68}** As appellee points out, appellant fails to show prejudice other than to generally refer to a "reasonable probability of a different result."  However, our review of the evidence adduced at trial reveals overwhelming evidence of guilt.  Forensic Pathologist Dr. Susan Brown testified that the victim died of "multiple blunt

force injuries . . . to his head." The victim received multiple bruises, abrasions, and lacerations to his face, a fractured nose, fractures and internal bruising to his skull, a subarachnoid hemorrhage, and multiple injuries that contained a "very distinct design or pattern." Brown testified that to leave patterned marks on Sapp's body would require "significant force," consistent with someone stomping on the victim's head, or "any kind of blunt force trauma by whether it's a . . . hand, or a foot, or an object." Importantly, Brown emphasized that the victim had no injuries to his hands.

{¶69} Consequently, after our review of the trial record as a whole, we believe that appellee adduced overwhelming evidence that appellant brutally murdered his cellmate. Based upon the evidence adduced at trial, the jury could certainly question the credibility of appellant's testimony. *See State v. Purdin,* 2013-Ohio-22, ¶ 19 (4th Dist.). A jury, sitting as the trier of fact, may choose to believe all or part or none of the testimony of any witness who appears before it. *State v. Daniels,* 2011-Ohio-5603, ¶ 23 (4th Dist.) Immediately after the assault, appellant told Corrections

Officer Truitt that Sapp "fell off his bunk," and told Corrections Officer Brabson, "I woke up and found him like this." Later, at trial, appellant testified that he assaulted Sapp in self-defense and claimed that Sapp brutally attacked him and "choked him out," despite officer testimony and photographs that showed injuries only to appellant's hands. Thus, because in the case sub judice the jury could choose to believe that appellant fabricated his trial testimony, the jury could also choose to disregard appellant's contention that he took these actions in self-defense.

**{¶70}** It is well settled that debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if a better strategy is available. *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995); *State v. Lawrence,* 2019-Ohio-2788, ¶ 19 (12th Dist.). In the case sub judice, however, even if, for purposes of argument, trial counsel's failure to argue that Sapp's statement was admissible as evidence of a plan, intent or motive under Evid.R. 404(B) constituted ineffective assistance, appellant nevertheless failed to establish a "reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *State v. Spaulding*, 2016-Ohio-8126, ¶ 153, quoting *Strickland* at 694. Here, the record before us is replete with evidence that appellant committed the charged crime. Thus, pursuant to *Spaulding*, we do not believe appellant demonstrated prejudice, even if counsel's failure to argue Evid.R. 404(B) arguably fell below effective representation. *State v. Jones*, 2018-Ohio-1130, ¶ 18 (1st Dist.). Thus, we do not believe trial counsel provided deficient performance, nor do we find prejudice.

{¶71} Therefore, we conclude that the impact of the trial court's decision to sustain appellee's objection to testimony and evidence relating to an allegation that the victim made a general threat to "any inmate who would be placed in his cell," does not rise to the level of prejudice as defined by *Strickland*. In light of the overwhelming evidence of appellant's guilt, we conclude that no reasonable probability exists that appellant would have been acquitted, but for defense counsel's inability to persuade the trial court to admit this evidence. Thus, appellant fails to establish that he received ineffective assistance of counsel.

{¶72} Accordingly, for all of the foregoing reasons, we overrule appellant's second assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

50

JUDGMENT ENTRY

It is ordered that the judgment be affirmed.  Appellee shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J. & Wilkin, J.: Concur in Judgment & Opinion

For the Court

BY:_____
                                    Peter B. Abele, Judge

NOTICE TO COUNSEL
     Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.