[Cite as *State v. Dalton*, 2025-Ohio-1840.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 24CA4078 |
| Plaintiff-Appellee, | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| v. | : | |
| Anthony Dalton, | : | **RELEASED 5/20/2025** |
| Defendant-Appellant. | : | |

_____

<u>APPEARANCES</u>:

Gene Meadows, Jackson, Ohio, for appellant.

Shane A. Tieman, Prosecuting Attorney, and Jay Willis, Assistant Prosecuting Attorney, Portsmouth, Ohio, for appellee.

_____

Hess, J.

{¶1}   Anthony Dalton appeals from a judgment of the Scioto County Court of Common Pleas convicting him, following a jury trial, of felonious assault and violating a protection order. Dalton presents two assignments of error asserting that the guilty verdict for violating a protection order is not supported by sufficient evidence and that the guilty verdicts on both counts are against the manifest weight of the evidence. For the reasons which follow, we overrule the assignments of error and affirm the trial court's judgment.

I. FACTS AND PROCEDURAL HISTORY

{¶2}   Dalton was indicted on three counts: (1) Count One – felonious assault in violation of R.C. 2903.11(A)(1) and (D)(1)(a), a second-degree felony; (2) Count Two – felonious assault in violation of R.C. 2903.11(A)(2) and (D)(1)(a), a second-degree felony;

and (3) Count Three – violating a protection order in violation of R.C. 2919.27(A)(1) and (B)(4), a third-degree felony.  He pleaded not guilty, and the matter proceeded to a jury trial.  We summarize some of the evidence below.

## A.  Testimony of A.W.

{¶3}    A.W. testified that Dalton was her boyfriend and that she has a protection order against him but let him move back in with her because "he said he was staying clean and had a job."  On February 4, 2024, after having been up all night arguing with Dalton, A.W. asked him to leave. She took her son somewhere, and when she came home, Dalton's truck was in the carport.  She parked behind the truck to hide it. She thought that if Dalton was caught violating the protection order, she would go to jail too.

{¶4}    She went in the bedroom and told Dalton "to get the hell out," and he kicked her in the back of the head.  She said, "I'm leaving," and Dalton said that he would burn the house down and make her lose her job.  She went outside and got in her car. He opened the driver's side door and started hitting her.  He knocked her glasses off, breaking them. He pulled her out of the car and got into his truck.  She was "hysterical" and got back into her car.  He started pushing her car down the driveway with his truck, parked by the front door, and then started taking stuff from the house. They cussed at each other, and Dalton started throwing rocks from the flower bed, breaking one of her car windows. She got mad, exited her car, got a rock, and threw it at his truck.  It bounced off a window but did not break it.  Dalton heard this and came outside, and she knew she "was in trouble."  Dalton grabbed her hair, pulled her into the yard, and started hitting her in the head, shoulders, and back with closed fists.  He pushed her to the ground and kept hitting her.  Then he kicked her in the "mouth, the side of [her] face," and she saw "white."

She was not sure if he knocked her out.  The State presented evidence that she sustained a fracture of the upper jaw, and the root of one of her teeth was dislocated.

{¶5}    A.W. touched her face and saw that her hand was covered in blood.  Dalton said, "[Y]ou deserved that bitch, you fucking cunt."  A.W. said he was going to jail, got in her car, and moved it to the end of the driveway.  She could not drive away because she "was hurting" and "couldn't see." Dalton had plenty of room to leave, but he hit her car with his truck, backed up, and then hit her car again so hard it almost went into a creek. He "took off," and she "pulled back in" and called 911. A.W. testified that during this incident, she did not threaten Dalton or use force against him, ram her car into his truck, or break his finger.  She testified that Dalton had broken his finger prior to this incident, and it had been "cricked up . . . for about a year."

B.  Testimony and Body Camera Footage of Deputy Megan Carver

{¶6}    Deputy Megan Carver of the Scioto County Sheriff's Office testified that on February 4, 2024, she was driving by A.W.'s home and saw shattered glass in the roadway and a large rock on the fog line. About a half mile from the home, she saw a truck parked in the middle of a side street which took off in hurry, as if the driver had seen her and wanted to get away from her as quickly as possible.  A 911 dispatcher advised her there was an active domestic incident at A.W.'s home and described the involved vehicle.  Deputy Carver advised the dispatcher she had just seen the vehicle and tried to stop it.  She could not find the truck and went to A.W.'s home, where she saw A.W. had "multiple lacerations" and was bleeding from "multiple areas."

{¶7}    A.W. said Dalton caused her injuries.  Dalton later told Deputy Carver that A.W. was the primary aggressor, that she hit him "upside the head," and that he had a

knot on his head. Deputy Carver initially testified that she did not see a knot. Later, she testified that Dalton had "a small bump" on his forehead, and when asked if she observed the knot on his head, she said, "Yes." Dalton claimed he had a cut or scratch on his elbow, but Deputy Carver did not see one. Dalton also claimed A.W. scratched his foot, but Deputy Carver did not see any injury to his foot. She testified he had a scratch on a pinky knuckle and blood on a pinky finger. Later, she testified there was no injury on his hand; just blood. She testified that he had blood splatter on his jeans, but he was not bleeding. She did not see any blood on his steel-toed boots.

{¶8} On Deputy Carver's body camera footage of her interaction with Dalton, he indicates A.W. hit him on the head with something, but he does not know what. At one point, Dalton claims A.W. hit the front, sides, and back of his truck in the front yard. He then says, "I come out of the house, she's walking towards it with a daggone rock," so he pushed her down and might have hit her or kicked her, but he does not remember. Later, when Deputy Carver says that A.W. was covered in blood, he says, "If she's covered in blood that's whatever she did to herself." Dalton mentions blood on his finger but does not claim it is broken at that time. He later says, "I understand you have to arrest me because of the . . . protection order. I understand. I'm stupid for going back to her." He claims A.W. had a rock that was bigger than a softball, about the size of volleyball, and was "gonna hit me, my property." He claims A.W. was going to throw a rock through his window first, and after he pushed her down, he picked up the rock and "busted hers when she was going to block the driveway." At one point, Deputy Carver says, "Moral of the story though, you knew that there was a protection order, so you shouldn't have went anyway." Dalton says, "Yes ma'am," and "I'm guilty of that but I couldn't help it cause I

love her." Later, when they are again discussing Dalton's injuries, he makes no mention of a broken finger. He claims he got "hit a bunch for no reason," and A.W. "got struck one time." Over an hour into the encounter, he says, "Look she broke my finger. I can't straighten my finger."

## C. Exhibits

**{¶9}** Among other things, the exhibits included two R.C. 3113.31 domestic violence civil protection orders protecting A.W. and her son from Dalton—a September 2023 ex parte order which states it is effective until March 21, 2024, and a November 2023 order issued after a hearing which states it is effective until November 8, 2028. The orders prohibit Dalton from entering the residence or being within 500 feet of a protected person, even with a protected person's permission, and contain this notice:

> **NO PERSON PROTECTED BY THIS ORDER CAN GIVE YOU LEGAL PERMISSION TO CHANGE OR VIOLATE THE TERMS OF THIS ORDER. IF YOU VIOLATE ANY TERM OF THIS ORDER EVEN WITH THE PROTECTED PERSON'S PERMISSION, YOU MAY BE HELD IN CONTEMPT OR ARRESTED. ONLY THE COURT CAN CHANGE THIS ORDER. YOU ACT AT YOUR OWN RISK IF YOU DISREGARD THIS WARNING.**

## D. Testimony of Dalton

**{¶10}** Dalton testified that in September 2023, he was living with A.W., and she got a protection order against him. He was served with it and went to stay with his mother. But A.W. continued to contact him, and he moved back in with her and their son at A.W.'s invitation. When asked if he was "aware of the order saying that even if you were invited back to the premises by the petitioner, you, yourself, were not to be back around her," Dalton testified, "Uh, yes, I was guilty of violating the protection order."

{¶11}  Dalton testified that A.W. is a jealous person, and on February 3, 2024, she kept him up all night long because she thought he was cheating on her.  At one point, she tried to snatch his phone from him, and it hit the floor, shattering the screen.  Dalton told A.W. he was leaving.  She grabbed his bare foot and dug her long, acrylic nails into the top of it.  Dalton told her that he would get his stuff and leave but needed some rest.  A.W. dropped their son off somewhere, and Dalton thought she would go to work afterwards, but instead, she came home.  She grabbed his phone and tried to break it in half.  He took the phone back, and she grabbed his "privates and started squeezing and pulling at the same time."  He "started screaming" and "had to push her off." She claimed he scratched her.  She wrestled for his phone and broke his right pinky finger.

{¶12}  Dalton told A.W. that he was leaving, and while he was getting dressed, she went outside and used her car to hit his truck, which was under the carport.  He grabbed some work tools, got in his truck, put it in reverse, and pushed her car.  He positioned the truck by the front door, and A.W. used her car to repeatedly hit his truck.  He went in the house to get some more personal items. When he came out, he thought A.W. was preparing for "another head on collision," so he grabbed a rock and threw it, breaking a window in her car.  A.W. parked in a way that he could not exit the driveway, picked up the rock he had thrown, and ran at him while screaming.  He "kind of stepped in front of her" and put his arm up "to try to shield from the blow."  The rock bounced off his arm and hit him in the head.  He did not know if he grabbed her hair but thought he grabbed her shirt and pulled or pushed her down to the ground. She grabbed the rock again, and Dalton thought she was "going to kill me with it or something," so he kicked her in the face

once.  He got in his truck, and A.W. "scrambled for her car" and tried to block his exit. She hit the truck again.  Afterwards, he was able to spin her car enough to escape.

{¶13}  Dalton admitted that he caused some injury to A.W. but denied seeing her bleed.  He had no intention of hurting her, "only wanted to stop her," and believed he acted in self-defense  He feared grievous bodily harm or death when A.W. came at him with the rock and "pretty much the whole time" because in the past, she had threatened to have her nephew, who lived within a couple hundred yards of the house, or sons shoot him.  Dalton testified that in addition to the "claw marks" on his foot and broken finger, he had a "scratch or something" by his pinky nail, "something" on the top of his hand, and a lump on his arm and lump on his head from the rock.  Dalton admitted that when he left the house, he did not go to the hospital or urgent care.  He was scared and wanted to get away from A.W.'s house and "maybe her relatives" and get to his own house, "a safe place."  He testified that he received no medical treatment in jail beyond the taking of his pulse and blood pressure even though he requested treatment for his broken finger and a possible concussion and spent three days in a coma.

## E.  Verdict and Sentencing

{¶14}  The jury found Dalton guilty on Count One and Count Three. The jury did not reach a verdict on Count Two, and the trial court dismissed it.  The court sentenced Dalton, and this appeal followed.

## II.  ASSIGNMENTS OF ERROR

{¶15}  Dalton presents two assignments of error:

1. The verdicts finding the Defendant-Appellant guilty of Felonious Assault in violation of RC 2903.11 and Violating a Protection Order in violation of RC 2929.27 are against the manifest weight of the evidence.

2. The verdict finding the Defendant-Appellant guilty of Violating a Protection Order is not supported by sufficient evidence.

### III.  STANDARDS OF REVIEW

{¶16}  In reviewing the sufficiency of the evidence for a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, fn. 4 (1997), and following *Jackson v. Virginia*, 443 U.S. 307 (1979).  "A sufficiency assignment of error challenges the legal adequacy of the state's prima facie case, not its rational persuasiveness." *State v. Anderson*, 2019-Ohio-395, ¶ 13 (4th Dist.).  "That limited review does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Musacchio v. United States*, 577 U.S. 237, 243 (2016), quoting *Jackson* at 319.

{¶17}  In determining whether a conviction is against the manifest weight of the evidence, an appellate court

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary.  In order to satisfy this test, the state must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt.
>
> Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence.  However, we are reminded that generally, it is the role of the jury to determine the weight and credibility of evidence.  " 'A jury, sitting as the trier of fact, is free to believe

all, part or none of the testimony of any witness who appears before it.' "
*State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338,
¶ 17, quoting *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-
1941, ¶ 23. We defer to the trier of fact on these evidentiary weight and
credibility issues because it is in the best position to gauge the witnesses'
demeanor, gestures, and voice inflections, and to use these observations
to weigh their credibility.

(Citations omitted.) *Anderson* at ¶ 14-15. "'Ultimately, a reviewing court should find a trial

court's decision is against the manifest weight of the evidence only in the exceptional

case where the evidence weighs heavily against the decision.'" *State v. Allen*, 2022-Ohio-

1180, ¶ 27 (4th Dist.), quoting *State v. Gillian*, 2018-Ohio-4983, ¶ 28 (4th Dist.), citing

*State v. McKelton*, 2016-Ohio-5735, ¶ 330.

## IV. FELONIOUS ASSAULT

**{¶18}** In the first assignment of error, Dalton contends, in part, that the guilty

verdict for felonious assault was against the manifest weight of the evidence. Dalton

acknowledges he struck A.W. but asserts that he did so "only after she had hit him with a

rock and in an effort to protect himself." He also acknowledges he pushed A.W.'s car but

asserts that he did so "only in an attempt to move her car so [he] could leave the

residence." Dalton claims the fact that A.W. admitted she left the residence and returned

is "an indication that she instituted the conflict" and creates reasonable doubt as to his

guilt. He also claims there is "reasonable doubt as to the truthfulness" of A.W.'s testimony

because she had a protection order against him, she created a violation of the order by

inviting him back to the house, and he had been staying there about a month at the time

of the incident.

**{¶19}** R.C. 2903.11(A)(1) states: "No person shall knowingly . . . [c]ause serious

physical harm to another . . . ." Dalton does not specifically argue that the State failed to

introduce substantial evidence on any of these elements.  Rather, he suggests the State

failed to disprove his claim that he acted in self-defense.

**{¶20}**  R.C. 2901.05(B)(1) states:

> A person is allowed to act in self-defense . . . .  If, at the trial of a person
> who is accused of an offense that involved the person's use of force against
> another, there is evidence presented that tends to support that the accused
> person used the force in self-defense, . . . the prosecution must prove
> beyond a reasonable doubt that the accused person did not use the force
> in self-defense . . . .

**{¶21}**  "If a defendant produces sufficient evidence of self-defense, the prosecution

has a duty to overcome that evidence."  *State v. King*, 2025-Ohio-351, ¶ 63 (4th Dist.),

citing R.C. 2901.05(B)(1).  Here, the trial court gave the jury a self-defense instruction,

which means the trial court concluded Dalton put forward sufficient evidence that he acted

in self-defense.  *See State v. Messenger*, 2022-Ohio-4562, ¶ 26.  To overcome the self-

defense claim, the State had to only disprove one element of the defense by proof beyond

a reasonable doubt.  *King* at ¶ 65.  The court instructed the jury:

> To prove that defendant's use of deadly force was not in self-defense the
> State must prove beyond a reasonable doubt at least one of the following:
> A. the defendant was at fault in creating the situation giving rise to the affray;
> or, B. the defendant did not have reasonable grounds to believe that he was
> in imminent danger of death or great bodily harm; or, C. the defendant did
> not have an honest belief even if mistaken that he was in imminent danger
> of death or great bodily harm; or D. the defendant used unreasonable force.

The State's burden of disproving a self-defense claim beyond a reasonable doubt is

subject to a manifest-weight review on appeal.  *Messenger* at ¶ 27.

**{¶22}**  Dalton suggests that he was not at fault in creating the situation giving rise

to the affray, but even if true, the State only has to disprove one element of self-defense

beyond a reasonable doubt in order to sufficiently disprove a self-defense claim.  Dalton

suggests the State did not disprove the other elements because A.W. is not credible given

the fact that she invited him to her home despite having a protection order against him, and he had been living there for about a month prior to this incident. But those facts do not make A.W.'s testimony inherently incredible.

**{¶23}** Again, "'"[a] jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it."'" *Anderson*, 2019-Ohio-395, at ¶ 15 (4th Dist.), quoting *Reyes-Rosales*, 2016-Ohio-3338, at ¶ 17 (4th Dist.), quoting *West*, 2014-Ohio-1941, at ¶ 23 (4th Dist.). "When conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury rejected the defendant's version of the facts and believed the testimony presented by the state." *State v. Hall*, 2014-Ohio-2959, ¶ 2 (4th Dist.). The jury was free to reject Dalton's testimony that A.W. ran at him with a rock while screaming, that he pushed or pulled her to the ground, that she grabbed the rock again, and that he kicked her in the face to protect himself because he thought she was going to kill him. Notably, this testimony did not match what Dalton initially told Deputy Carver about the rock—that after A.W. hit the front, sides, and back of his truck in the front yard, "I come out of the house, she's walking towards it with a daggone rock," and he pushed her down and might have hit her or kicked her, but he did not remember.

**{¶24}** After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses after according the requisite deference to the jury's determinations, we conclude that in resolving evidentiary conflicts, the jury did not clearly lose its way or create such a manifest miscarriage of justice that we must reverse Dalton's conviction for felonious assault. Accordingly, we conclude the

felonious assault conviction was not against the manifest weight of the evidence. We overrule the first assignment of error to the extent it asserts otherwise.

## V.  VIOLATING A PROTECTION ORDER

{¶25}  In the remainder of the first assignment of error, Dalton contends the guilty verdict for violating a protection order was against the manifest weight of the evidence. In the second assignment of error, he contends the guilty verdict for violating a protection order is not supported by sufficient evidence.

{¶26}  R.C. 2919.27(A)(1) states:  "No person shall recklessly violate the terms of . . . [a] protection order issued or consent agreement approved pursuant to section 2919.26 or 3113.31 of the Revised Code[.]"  R.C. 2919.27(B)(4) states:  "If the offender violates a protection order or consent agreement while committing a felony offense, violating a protection order is a felony of the third degree."  R.C. 2919.27(D) states:

> In a prosecution for a violation of this section, it is not necessary for the prosecution to prove that the protection order or consent agreement was served on the defendant if the prosecution proves that the defendant was shown the protection order or consent agreement or a copy of either or a judge, magistrate, or law enforcement officer informed the defendant that a protection order or consent agreement had been issued, and proves that the defendant recklessly violated the terms of the order or agreement.

R.C. 2901.22(C) states:

> A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature.  A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

{¶27}  Dalton contends that there is insufficient evidence to support the violating a protection order conviction, and it is against the manifest weight of the evidence, because

the protection order is void due to the fact that the protected person, A.W., invited him to violate it. Dalton cites no legal authority to support his position. Moreover, his position is inconsistent with the plain language of the protection orders, which warned him that no protected person could give him legal permission to violate the terms of the orders and that only the court could change the orders.

{¶28} Dalton also contends there is insufficient evidence that he acted recklessly. Dalton quotes the above definition of recklessness and asserts that he had "no reason to believe that any circumstance exists when he is invited to disregard the protection order that the victim requested." He claims "[i]t is not unreasonable to believe that there is no risk when the protected party disregards the protection order and invites the restrainee to her residence." But the protection orders state that Dalton could not enter the residence or be within 500 feet of a protected person and warned that no protected person could give him legal permission to violate the terms of the orders and that only the court could change the orders. The orders even stated: "**YOU ACT AT YOUR OWN RISK IF YOU DISREGARD THIS WARNING.**" And when asked if he was "aware of the order saying that even if you were invited back to the premises by the petitioner, you, yourself, were not to be back around her," Dalton testified, "Uh, yes, I was guilty of violating the protection order." Thus, the evidence shows he not only recklessly violated a protection order but intentionally did so, living with A.W. knowing it was prohibited despite her invitation.

{¶29} After viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of violating a protection order proven beyond a reasonable doubt. And after reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses

after according the requisite deference to the jury's determinations, we conclude that in resolving evidentiary conflicts, the jury did not clearly lose its way or create such a manifest miscarriage of justice that we must reverse Dalton's conviction for violating a protection order. Because the conviction for violating a protection order is supported by sufficient evidence and not against the manifest weight of the evidence, we overrule the remainder of the first assignment of error and the second assignment of error.

## VI. CONCLUSION

{¶30} Having overruled the assignments of error, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
     Michael D. Hess, Judge



## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**